TJOFLAT, Circuit Judge,
concurring.
As the court’s opinion indicates, the outcome of this appeal turns on the resolution of one issue: whether the district court abused its discretion when it denied appellant’s motion to prohibit the use of the stun belt and required appellant to wear it throughout the course of his trial. To resolve this issue, we look over the district judge’s shoulder and examine the information before the court at the time the ruling was made. And we ask what it was that prompted the judge to decide that leg shackles would be inadequate and that a stun belt would be necessary if those in the courtroom were to be protected.
*1310 Appellant’s trial was scheduled to commence on Monday, February 7, 2000. On Friday, February 4, at 4:10 p.m., appellant’s attorney filed a “Motion to Prohibit Use of a 'Stun Belt.’ ” The record does not indicate when the motion was brought to the court’s attention. All that the record shows is that the court had the motion before it the following Monday, February 7, after the jury had been selected for appellant’s trial.[1] As far as I can tell from the record, this was the court’s first notice that the Government planned on restraining appellant with a stun belt. The motion informed the court of the following:
A “stun belt” is a device which is designed to deliver a non-lethal electric shock to the wearer. It is triggered by a remote control device, in the custody of a law enforcement officer. It is designed to cause such incapacitating pain and shock that a defendant cannot control his muscles.
[The defendant] has not been told what would cause the officer to trigger the belt. He fears that a question of his counsel, an inquiry of the court, a prompt to voice an objection, even a simple request to be heard, might make a trigger-happy deputy U.S. Marshal conclude that he was acting inappropriately and set off the painful device.
[W]hat sort of device is being proposed[?]
[What are the] entena for triggering the device, including both positive wrongdoing (sudden movements, etc.) and negative ones (failure to respond to a command[?])
[What are the] immediate effects of the receipt of one shock on [an] individual^]
[What are the] identity, training, and instructions of the deputy or deputies expected to control the remote trigger[?]
The most commonly-used stun belt device is called a R.E.A.C.T. (“Remotely Electronically Activated Control Technology”), manufactured by StunTech. The belt administers 50,000 to 70,000 volts, the shock is sustained for approximately eight seconds, it is triggered by a hand-held transmitter, and typically causes the recipient to lose control of his limbs, to fall to the ground, and often to defecate or urinate upon himself.
As one commentator has stated:
“Physical effects are not the only possible consequence of activating the security belt. StunTech’s literature promotes the belt to law enforcement officials as necessary ‘for total psychological supremacy ... of potential troublesome prisoners.’ ... [T]he belt’s effect on prisoners is, in fact, primarily psychological. Furthermore ... the belt acts more as a deterrent rather than a means of actual punishment because of the tremendous amount of anxiety that results from wearing a belt that packs a 50,000 to 70,000 volt punch. If the belt’s wearer were to focus on the possible pain and humiliation that he would suffer should the belt be activated, he would then be rendered incapable of effectively participating in his defense and thus deprived of his Sixth Amendment right to counsel.”
Following this recitation, appellant’s motion argued as follows:
By forcing a defendant to wear a stun belt, the [Government] directly interferes with his mental state, inducing ex *1311 treme fear of receiving 50,000 to 70,000 volts of electricity. There can be no question but that this fear chills the exercise of the defendant’s trial rights, including altering his outward appearance and affecting his decision whether or not to testify, his ability to follow the proceedings, the substance of his communication with counsel, and his ability to actively cooperate with and assist counsel. How is a defendant to understand the assurance that he can, for example, consult with counsel, if the assurance comes at the price of unremitting fear and uncertainty that the very act of consultation may be misinterpreted as “inappropriate behavior,” and precipitate a shock?
The information contained in this motion is all that the court had before it when the hearing on appellant’s motion to prohibit use of the stun belt began.[2] With the motion in hand, the court asked appellant’s attorney, Mr. White, to proceed. White briefly described the stun belt, stating that, when activated by a “remote control device,” it delivered “from 50 to 70 thousand volts of electricity for approximately five to eight seconds,” and then said that he was “concerned that [his client was] more concerned about receiving such a jolt than he is about thinking about the testimony and giving me aid and assistance in the defense of his case.” Appendix, at 1312-13. In short, White reiterated the argument he had made in the motion he had filed the previous Friday afternoon; in addition, he pointed out that his client was already in “leg shackles.” Appendix, at 1313. The Government’s response, by Mr. Knight, provided the court with the reason the government wanted to use a stun belt in addition to the leg shackles. Knight said that (on a date he did not disclose), appellant had attempted to escape from a jail in Tampa, Florida, that he had been contemplating escaping from the Escambia County Jail, where he was currently being held, and that he had a handcuff key in his possession when he was arrested in California (again, on a date he did not disclose).
Mr. White responded to Knight’s statement by informing the court that, at the time he first met appellant (following his appointment as appellant’s attorney on January 21, 2000) at the Escambia County Jail, appellant was in the general population. They met in the “visiting room,” and there were “no shackles, no handcuffs, no extra security.” Appendix, at 1313. “And now we get to trial and he’s shackled.... I understand that we need to take security, and that’s why he has leg shackles on him. But this stun belt thing is interfering with my ability to communicate and for me to be able to defend him.” Appendix, at 1313-14.
After entertaining a brief response from Mr. Knight, the court stated that “Mr. Durham has a heightened security risk above average for a criminal trial.” Appendix, at 1314. It then asked whether there were “alternative ways” to attach the stun belt, other than on the defendant’s back. There were none. After being assured by a deputy Marshal that the Marshals were “trained in how it operates,” the court stated that “this is a minimal intrusion into the defendant’s normal liberties of exercising his arms and sitting in the chair. And I don’t find that there is any rational basis for him to be unduly apprehensive so as to in any way interfere *1312 with his ability to participate and advise [his attorney] as part of his defense. So the motion is denied.” Appendix, at 1314-15.
Looking over the judge’s shoulder, I find no evidence in the record to suggest, much less establish, that the leg shackles would not have sufficed as a security restraint. Nor do I find anything in the record indicating that the court even considered the contents of appellant’s motion to prohibit the use of the stun belt. The motion contained more than counsel’s argument; it recited the literature accompanying StunTech’s device and quoted what one commentator had to say about it:
Physical effects are not the only possible consequences of activating the security belt. StunTech’s literature promotes the belt to law enforcement officials as necessary “for total psychological supremacy ... of potential troublesome prisoners.” If the belt’s wearer were to focus on the possible pain and humiliation that he would suffer should the belt be activated, he would then be rendered incapable of effectively participating in his defense and thus deprived of his Sixth Amendment right to counsel,[3]
(emphasis added).
Notably, the Government said nothing— neither in a written response to appellant’s motion nor at the hearing — to dispute these representations concerning the stun belt’s effect. If these representations are true — and, because the Government has not refuted them, I accept them as true— then the court’s statement that there was “no rational basis for [appellant] to be unduly apprehensive so as to in any way interfere with his ability to participate and advise [counsel] as part of his defense” is cleariy erroneous, and requiring appellant to wear the device throughout his trial constituted an abuse of discretion.
APPENDIX
PROCEEDINGS.
(Jury selection not transcribed.)
(Jury not present.)
THE COURT: Let the record show that the defendant is here. The attorneys are here. The jury is out. And we have two motions from the defendant. Let’s take those up at this time.
Mr. White?
MR. WHITE: Your Honor, our first motion is that — requesting that we—
THE COURT: Are there papers over that?
MR. WHITE: There are none over it, Your Honor. There are some within two inches of it.
THE COURT: Nowit’s fine.
MR. WHITE: Thank you.
We are requesting that the court prohibit the use of this stun belt. The stun belt, as I understand it, delivers from 50 to 70 thousand volts of electricity for approximately five to eight seconds at approximately .003 amperes. It’s controlled by a remote control device. I know not where that is in the courtroom, but I assume it is, and I believe it is, an infringement on the attorney-client relationship. My client is sitting here, and I’m concerned that he is more concerned about receiving such a jolt than he is about thinking about the testimony and giving me aid and assistance in the defense of his case.
*1313 In a similar case that we litigated in Santa Rosa County recently it was testified to and I will proffer to the court, that this thing is remote controlled by radio waves and there have been instances of accidental detonations by persons in or outside the courthouse, but not the person with the control switch.
In addition, Your Honor, this is physically located on my client’s back such that it protrudes. I’m guessing three inches, and that three inches prevents him from sitting back in his chair. And each time he leans backwards to lean over to speak with me, it causes him pain in the small of his back. We would ask Your Honor to consider this and have it removed. He is shackled by leg shackles, Your Honor.
THE COURT: Who’s gonna guideline respond? Mr. Knight?
MR. KNIGHT: Your Honor, of course, the defendant’s comfort has to be balanced against safety, the safety factor. In this case the defendant has made one attempt to escape from Tampa a during which he wrestled with a corrections officer for control of a gun. There is evidence to suggest that there was an attempted escape or planned escape or measures taken to escape from the Escambia County Jail. Evidence that the government will introduce in this case will show the presence of a handcuff key that Mr. Durham had in his possession when he was arrested in California. I think in light of the activities that the defendant has been involved with since he’s been incarcerated or awaiting trial and his activities in Tampa, and given the fact of this particular evidence that we have, the court has to balance his comfort with the need of everyone in the courtroom to be safe.
MR. WHITE: May I respond briefly, Your Honor?
THE COURT: Sure.
MR. WHITE: There seems to be no logical application of security measures here. When I first met Mr. Durham, I met him in the Escambia County Jail. My understanding was that he was in general population. They brought him like they would bring any another client for me to visit with. They put him in the visiting room with me as they would any other person. He had no shackles, no handcuffs, no extra security and I spent whatever time it was that I spent with him uneventfully. But now we get to trial — even— even at the time that I met with him this Tampa thing had occurred. And now we get to trial and he’s shackled. And yesterday when I met with him at the Santa Rosa County Courthouse it was extraordinary security measures, four guards brought him in with pepper spray, one with a stun shield, brought him in a wheelchair blindfolded. The application of security measures seems to ebb and flow. I understand that we need to take security, and that’s why he has leg shackles on him. But this stun belt thing is interfering with my ability to communicate and for me to be able to defend him.
Thank you, Your Honor.
THE COURT: Well, I don’t know if it’s interfering with your ability to communicate with him. He’s right beside you and you can communicate with him, but it obviously may interfere with his comfort.
Mr. Knight, do you want to respond to that?
MR. KNIGHT: Nothing else, Your Honor. The fact that the marshals might not have been aware at the time that Mr. Durham was first brought here about the incident in Tampa doesn’t decrease from the situation that the court has before it. And the fact that Mr. Durham again involved himself in an escape attempt from *1314 the Santa Rosa County Jail, you know. I think, again, are things that the court has to consider. The fact that when Mr. White first met him, the marshals or the jail personnel weren’t aware of the situation doesn’t excuse the need for the belt.
THE COURT: Well, certainly, this is not the first time that I’ve had one of these devices utilized in a trial and it probably will not be the last. And in each instance you have to consider what the threat is and how serious the threat is and balance the circumstances. And there is no doubt in my mind that Mr. Durham has a heightened security risk above average for a criminal trial. I don’t know that there is any — well, I’m not sure if there are alternative ways that they can attach this device, other than on his back. I don’t know. Are there? Anybody know?
MR. SMITH: (Nodded negatively).
MR. KNIGHT: Your Honor, I think Mr. Smith from the Marshal’s Office can answer that for the court, ,but I don’t believe that they are available.
MR. SMITH: Your Honor, it’s in the area where it’s supposed to be placed. That’s where it has to be placed to be effective.
THE COURT: Well, let me — let me also ascertain if there is any way that this could be accidently tripped or triggered. Can we avoid that?
MR. SMITH: We take precautions in that, Your Honor, and we are all trained in how it operates, and there won’t be any mistakes. And if it goes off, Mr. Durham is aware and is advised of the rules and regulations of how it works.
THE COURT: All right. Well, I certainly don’t want any accidental discharge of it.
But other than that, the motion has to be denied, Mr. White. Certainly, on balancing the interest, I think that this is a minimal intrusion into the defendant’s normal liberties of exercising his arms and sitting in the chair. And I don’t find that there is any rational basis for him to be unduly apprehensive so as to in any way interfere with his ability to participate and advise you as part of his defense. So the motion is denied.
All right. Let’s go to the second motion which is a motion to suppress. The government’s received the motion?
MR. KNIGHT: Yes, Your Honor.
THE COURT: All right. Are you prepared to proceed?
MR. KNIGHT: Yes, Your Honor.
THE COURT: Go ahead.
•MR. KNIGHT: Your Honor, we call Keld Hove.
(Pause.)
MR. WHITE: Your Honor, we would request the rule on witnesses apply for this hearing.
THE COURT: All right. For purposes of this hearing, then, I will apply the sequestration rule of 615 of the rules of evidence. And under that rule anyone who is in the courtroom now and anticipates being called as a witness is directed to leave the courtroom and remain out of the courtroom until this hearing is concluded or you have been excused from operation of the rule. And in the meantime you should not discuss your testimony or anything about this matter with anyone else or discuss it with anyone except the attorney who has you here as a witness or in that attorney’s presence or, for the gov *1315 ernment, in the presence of the government’s case agent.
And with that, we are ready proceed.

. Annexed to this opinion is a copy of the transcript of the hearing the court held that Monday morning on appellant's motion to prohibit use of the stun belt.

. Following jury selection, the court heard two motions which appellant had filed — the motion relating to the stun belt and a motion to suppress evidence. As page 6 of the transcript of the proceedings indicates, see Appendix, the court heard and disposed of these motions in order.

. The record does not indicate whether the device employed in this case was a StunTech belt or a stun belt made by another manufacturer. In that the Government made no response to appellant’s motion to prohibit use of the belt, I assume that the device was StunTech’s.